## NORTHBILT MFG. CO. v. UNITED STATES.

### No. 311 Civil.

District Court, D. Minnesota, Fourth Division.

Jan. 13, 1942.

Firestone & Shapiro, of St. Paul, Minn., for plaintiff.

Victor E. Anderson, U. S. Atty., and Russell C. Rosenquest, Asst. U. S. Atty., both of St. Paul, Minn., for defendant.

NORDBYE, District Judge.

The Northbilt Manufacturing Company entered into a written contract on May 27, 1938, with the Government, wherein and whereby it agreed to furnish and deliver at the Eighth Corps Area General Depot, Fort Sam Houston, Texas, 18,824 mackinaw coats, in accordance with certain specifications and the terms and conditions of said contract, for a consideration of $61,178. It appears that the defendant has paid $59,-530.26, but has retained $1,647.74 on account of delays in complying with the contract with respect to deliveries. This suit in effect contests the right of the Government to retain any money by way of liquidated damages and seeks recovery of the sum so retained. It is stipulated that, if the Government is sustained in its right to retain liquidated damages, the sum withheld is correct and not unreasonable in amount.

The requirements of the contract with reference to deliveries provided that, in ninety days, or by August 29, 1938, five per cent should be delivered; during the next sixty days, or by October 28th, thirty per cent; during the next thirty days, or by November 27th, thirty per cent; and the remaining thirty-five per cent by March 27, 1939.

Deliveries were made on August 27th of some 1,080 coats. Of this number, 805 were accepted and 275 were rejected. On September 21st, 3,258 coats were delivered, and of this number 2,541 were accepted and 717 rejected. The large number of rejections evidently caused considerable concern to the plaintiff, and it asserts that it suspended any further production because of the high rejections. That is, the rejections were so large that no profit could be made on the contract and there was a probability that it might have to break the contract and refuse to make any further deliveries. It seems that the primary cause for the rejections was due to defective stitching. Northbilt had employed a so-called overcast stitching at or on certain seams, and it was with regard to this workmanship that the Government inspectors rejected a large number of coats.

Article 4 of the contract provides: "Inspection.— * * * (c) Final inspection and acceptance of materials and finished articles will be made after delivery, unless otherwise stated. * * * Final inspection shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud. * * *"

After receiving notice of the rejections in the shipments referred to, representatives of Northbilt made trips to Fort Sam Houston. Conferences were held with Government officials, and it was apparently recognized by Northbilt that shoddy work had been done which caused an unworkmanlike product. See, Exhibits 73, 84, 94 and 121. It may be gathered that the overcast seams required careful and painstaking effort to avoid defective stitching. The result of these conferences led to the understanding that, in all future coat manufacturing under the contract, Northbilt would employ piped seams—a more expensive method—and thus avoid, if possible, the trouble which had arisen in connection with the overcast seams. The specifications provided that either overcast or piped seams could be used. The Government representatives agreed that, if the next shipment evidenced that the seam difficulties had been overcome by the use of the piped seam, they would be willing to make a reinspection of those goods which had been rejected in the September and October shipments.

The evidence indicates that the remaining shipments under the contract were free from most of the defects found in the earlier production. Piped seams had replaced the overcast seams, and, in accordance with the understanding, a reinspection of the earlier shipments was made. Of the 275 coats rejected on August 27th, the reinspection resulted in 197 of the rejected coats being accepted, as of November 9th, and of the 717 coats rejected on September 21st, 605 were accepted as of October 27th.

The penalty in question arose by reason of the failure of Northbilt to ship the speci-

fied number of coats on or before November 27, 1938. The contract in regard thereto provides in part: "Article 17. Delays— Liquidated damages. * * * The contractor shall not be charged with liquidated damages * * * when the delay in delivery is due to unforeseeable ·causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or the public enemy, acts of the Government * * *."

Plaintiff asserts that the Government was responsible for the delay which resulted in its failure to deliver the required quantity of coats in November; that is, according to plaintiff's position, the reinspection, resulting in the acceptance of so many coats which had been rejected, is impelling evidence that the original rejections were unwarranted. The plaintiff further asserts that, by reason of the·unusual number of the original rejections, production ceased, and hence the delay in complying with the shipments as provided in the contract. The difficulty, however, with plaintiff's position is that its initial premise is unsound. The evidence will not justify a finding that the Government inspectors assumed an arbitrary or even an unwarranted position in making their original rejections. That there was defective stitching in the mackinaws rejected must be conceded. Plaintiff recognized this fact, at least tacitly, in its correspondence with the Government agents. True, all of the defects referred to by the inspectors might not greatly impair the serviceability of the mackinaws, but the rejection or acceptance fairly came within the determination of the inspectors. The situation peculiarly presented a problem for the determination and decision of qualified persons clothed with the duty of inspection. Fraud or bad faith on the part of the inspectors is not charged. It may well be that, in the shipment of a large number of coats, the inspectors would find that the condition of some was more aggravated than others, but that the shipment contained a large number of shoddy and unworkmanlike stitching cannot be gainsaid. While plaintiff now contends that it had ceased production by reason of the unusually large number of rejections, it·was apparently anxious to make good on its contract. It recognized that the overcast stitching which it had employed was the basic cause for the trouble. It was urged that the use of piped seams would overcome the difficulties and

it apparently did. In passing, it may be noted that plaintiff contends that a Government representative had informed it, when samples were submitted, that overcast seams were required, but concededly the specifications must govern in that regard, and they provided for the use of either type of seam. The mere fact that the Government inspectors, after being convinced that no more seams with shoddy stitching would occur in the future, reinspected the garments rejected and were more tolerant of the defects which had theretofore caused rejection, resulting in the acceptance of October 27th and November 9th hereinbefore referred to, does not justify the conclusion that the original inspections were erroneous. No mathematical accuracy or absolute perfection could be obtained in the inspection which the coats required. Presumably, in every large shipment of such wearing apparel, in the exercise of their judgment, difference of opinion might result among honest and capable inspectors as to whether certain rejections should be made. Situations or conditions might occur which would, in their honest discretion, justify greater leniency than under other circumstances. The mere recognition of some of the practical problems confronting this manufacturer under the circumstances referred to, and the exercise of presumably good judgment in being less stringent in their reinspection upon receiving assurances that no such workmanship would be forthcoming in future deliveries, will not permit the Court to conclude that the original position of the inspectors was erroneous or unfair. True, the final inspection as to October 27th and November 9th is conclusive, but that fact does not necessitate or justify a finding that the inspectors erred in refusing to pass the rejected garments until it had been established that further production would not present the same type of unsatisfactory workmanship. It does not follow, therefore, that the original rejections were erroneous, and plaintiff has failed to establish by a fair preponderance of the evidence that any act or conduct of the Government was the proximate cause of the delay in fulfilling the November deliveries.

If we assume that some of the original rejections were captious or hypercritical, there is, notwithstanding, an utter absence of any satisfactory evidence as to the number or extent of rejections which should be so characterized. Concededly, many of the

rejections were due to defective stitching, raw edges, skipped stitches, broken stitches, etc. Plaintiff contends that it would have been unwise to proceed further until it determined the cause for the large number of rejections, and, if possible, to rectify the situation. The extent to which the original rejections of coats, by reason of the alleged immaterial defects, contributed to, or became a factor in the cessation of manufacture, is entirely speculative.

Findings of fact and conclusions of law in accordance herewith may be submitted by the defendant.